## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

Amelia Reynolds, *on behalf of herself and those similarly situated*,

      Plaintiff,

v.

Concordia University, St. Paul,

      Defendant.

File No. 21-cv-2560 (ECT/DTS)

**OPINION AND ORDER**

Christopher P. Renz, Jeffrey D. Bores, and Bryan L. Bleichner, Chestnut Cambronne PA, Minneapolis, MN; Terence Coates and Dylan J. Gould, Markovits, Stock & DeMarco, LLC, Cincinnati, OH; and Joseph M. Lyon, The Lyon Law Firm, Cincinnati, OH, for Plaintiff Amelia Reynolds.

Jane Dall Wilson and Emanuel Lee McMiller, Faegre Drinker Biddle & Reath LLP, Indianapolis, IN; and Jane E. Maschka and Machen Bihrle, Faegre Drinker Biddle & Reath LLP, Minneapolis, MN, for Defendant Concordia University, St. Paul.

In July 2020, amid the COVID-19 pandemic, Plaintiff Amelia Reynolds enrolled in Concordia University, St. Paul's accelerated nursing program. In this putative class action, Reynolds alleges that Concordia failed to provide promised clinical, lab-simulation, and in-person instruction to her and similarly situated nursing students who paid tuition and fees for those experiences. Reynolds asserts common law breach-of-contract, quasi-contract, and misrepresentation claims and statutory claims under Oregon's Uniform Trade Practices Act. Concordia has moved to dismiss Reynolds's Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Concordia's motion will be granted in part and

denied in part.  Reynolds lacks standing to seek injunctive relief, has not shown a duty of care to support her negligent-misrepresentation claim, and has not plausibly alleged a claim under Oregon's Uniform Trade Practices Act.  Reynolds has, however, plausibly alleged claims for breach of contract, unjust enrichment, promissory estoppel, and reckless misrepresentation.

I[1]

Reynolds is an Oregon citizen and a former Concordia student.  Compl. ¶ 27 [ECF No. 1].  Concordia is a Minnesota nonprofit corporation.  *Id.* ¶ 26.  Concordia maintains its headquarters (and principal place of business) in St. Paul, Minnesota.  *Id.*

Reynolds enrolled in Concordia's Accelerated Bachelor of Science in Nursing ("ABSN") program on July 7, 2020.  *Id.* ¶ 30.  Concordia offers varied (though similar) versions of that program to students through campuses in St. Paul and Portland, Oregon.  *Id.* ¶ 26; *see* ECF No. 1-2 at 9–10.  Reynolds enrolled in a "hybrid" version of the ABSN program offered through Concordia's Portland campus.  Compl. ¶¶ 26–28, 30; ECF No. 1-2 at 10.

The ABSN curriculum spans sixteen months and is "comprised of 59 or 60 credit hours received over four consecutive, fulltime semesters"; upon completion, students receive a bachelor's degree in nursing.  Compl. ¶ 42.  The program's accelerated nature "attracts many students" but also "keeps many students in the program who might

---

[1]    In accordance with the standards governing a Rule 12(b)(6) motion, the facts come from Reynolds's complaint and materials embraced by it.  *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014).

otherwise depart; the rapid pace of the studies and the amount of money committed through just one or two semesters is so substantial that students are not able to simply stop their studies in the ABSN program and transfer to another program." *Id.* ¶ 43.

In June 2020, before she enrolled, Reynolds attended a "Fall 2020 Virtual Event," during which Concordia presented her with a document outlining the "Fall 2020 ABSN Curriculum in Portland." *Id.* ¶¶ 52–53, 73; *see* ECF No. 1-9. In this document, Concordia identified various types of "clinical experiences" it would offer to Fall 2020 matriculants. ECF No. 1-9 at 3. The document identified five courses with an "on-site clinical component." *Id.* at 4. It also informed prospective students they would "complete 59 credit hours of online didactic coursework, hands-on learning at our high-tech nursing site[,] and clinical practice at top local health care facilities." *Id.* at 3.

When she enrolled in July 2020, Concordia required Reynolds to sign two documents as a condition of her enrollment. First, Reynolds signed a "Registration Authorization Form" that outlined her coursework for the entire ABSN program. Compl. ¶ 51. The form identified the courses Reynolds would complete, the semester she would begin each course, the number of credits per course, and each course's "modalities." *Id.*; *see* ECF No. 1-1. Concordia classified each course's modality as one or a combination of "Didactic," "Lab," and "Clinical." ECF No. 1-1. Second, Reynolds was required to sign a "Summer 2020 Student Handbook." Compl. ¶ 68; *see* ECF No. 1-2. In that Handbook, Concordia made many statements about clinical, lab simulation, and other in-person experiences it offered (and required students to complete) in the ABSN program. Compl. ¶¶ 45, 69–70, 72; *see, e.g.*, ECF No. 1-2 at 10 (stating Portland Campus Hybrid program

3

includes "hands-on experiential learning" and "real-world clinical practice in local health care facilities"), at 10 (stating Portland Campus-Based program offers "face to face clinical and lab facilitated learning"), at 27–28 ("If clinical/simulation hours are not completed successfully, the student will fail the course and will be required to complete the entire course, on a space available basis[.]"), at 36 (outlining "Lab and Simulation Policy"), at 54–63 (providing course descriptions that include "clinical," "simulation," and "skills lab" components). These statements, and similar statements on Concordia's website, "formed the basis for [Reynolds]'s . . . understanding" of the "nursing simulation and skills laboratories" that Concordia offered through the ABSN program. Compl. ¶¶ 60, 65. "But for the hands-on lab and clinical hospital and field learning experience promised by Concordia," Reynolds would not have enrolled. *Id.* ¶ 29.

Despite these representations, Concordia had, during the preceding Spring 2020 semester, "drastically altered its course offerings" and "completely eliminated in-person learning" in response to the COVID-19 pandemic. *Id.* ¶ 66. "[S]imulations, skills labs, and clinicals were moved online, or students were given independent study assignments that did not involve real or simulated healthcare environments." *Id.*

When Reynolds started the ABSN program in Fall 2020, Concordia continued to represent that clinicals and lab simulations would be offered, including online and in class syllabi, but did not deliver those experiences to Reynolds or other students. During the Fall 2020 Semester, Concordia did not provide "nursing simulation labs," "real-world clinical practice in local health care facilities," "simulation experiences," or "open lab time for supervised practice," and it offered only "limited skills lab learning." *Id.* ¶ 71.

4

Reynolds was enrolled in NUP 350 that semester—a course described in her registration form as having lab and clinical modalities. *Id.* ¶ 30; *see* ECF No. 1-1. Reynolds paid a $120 lab fee for NUP 350, Compl. ¶ 31 (citing ECF No. 1-4), and, according to the course syllabus, NUP 350 offered "135.75 hours (beyond the didactic hours) including skills lab, simulation, and clinical experience," *id.* ¶ 30 (quoting ECF No. 1-3 at 5). During the semester, however, Reynolds did not receive "any in-person simulations or in-person clinical experiences in any medical settings under the direction of faculty or professionals." *Id.* ¶ 32. Though she participated in a "handful of in-person skills labs, she received less than originally promised." *Id.*[2]

During the Spring and Summer 2021 semesters, Concordia resumed offering clinicals to ABSN students, but on a more limited basis. Clinicals were offered to a "limited number of students" and "often outside of healthcare settings (*e.g.*, nursing homes and retirement communities)." *Id.* ¶ 76. Concordia assigned clinicals through a "secret lottery" that it did "not explain[] to students until late in the Summer 2021 [s]emester." *Id.*

During the Spring 2021 semester, Reynolds was enrolled in NUP 353—another course Concordia described as having lab and clinical modalities in her registration form. *Id.* ¶ 33; *see* ECF No. 1-1. The NUP 353 syllabus represented that it would include "4 clinical credits," including a clinical assessment of "Clinical Hours Attendance/Professionalism – 81 hours (72 clinical hours and 9 simulation hours)."

---

[2]     In December 2020, Concordia published a blog post misrepresenting that, "[f]or the fall 2020 semester, students and faculty resumed skills labs and clinical simulations, but at 50% of typical frequency." *Id.* ¶ 75.

Compl. ¶ 33; ECF No. 1-5 at 10.  Concordia nonetheless did not provide Reynolds with access to simulation labs during the Spring 2021 Semester.  Compl. ¶ 34.  And "although she was scheduled to receive 6 in-person clinical sessions in a clinical rehabilitation setting, she only received 3 sessions totaling approximately 24 hours of clinical experience, rather than the 72 hours that were promised."  *Id.*

The Summer 2021 version of Concordia's Student Handbook, revised in May 2021, included the same or similar representations about clinical, lab, simulation, and other experiences as the Summer 2020 version.  *See id.* ¶¶ 78–79 (collecting statements) (quoting ECF No. 1-6).  Reynolds was required to sign the Summer 2021 Handbook as a condition of her enrollment in the Summer 2021 semester.  *Id.* ¶ 80.  But that semester, only "some students received in-person simulations" and "only if they did not win the 'lottery' to receive in-person clinical experiences."  *Id.* ¶ 77.

For example, Reynolds was enrolled in NUP 410.  *Id.* ¶ 36.  NUP 410 was worth 3 clinical credits and its syllabus "estimated that 120 [course] hours would be clinical hours." *Id.*; *see* ECF No. 1-7 at 2, 6.  But Reynolds received no "in-person clinical classes or experiences in real-world medical settings under the direction of faculty or professionals." Compl. ¶ 37.  Reynolds also took NUP 411 during the Summer 2021 semester.  *Id.* ¶ 38. NUP 411 was worth 3 clinical credits and, according to its syllabus, would provide students an estimated 25 clinical hours.  *Id.*; *see* ECF No. 1-8 at 2, 7.  Reynolds received a clinical placement through NUP 411, but "it was in a non-medical setting, and she received less hours of training than were promised."  Compl. ¶ 39.

6

"Despite no longer providing important hands-on learning experiences, Concordia charged full tuition to ABSN students." *Id.* ¶ 81. Concordia has not refunded Reynolds for tuition and fees it charged her, including fees earmarked for "consumables and resources within courses and throughout the program (labs, simulations)." *Id.* ¶¶ 81–82; *see* ECF No. 1-4 at 2. Reynolds alleges that, during her first three semesters, Concordia failed to provide "hundreds of hours of in-person learning experience in simulated or clinical settings that she paid to receive," as summarized below:

| Semester | Course | Clinical Hours Promised | Clinical Hours Provided | Deficiency | # of Credit Hours Affected |
|---|---|---|---|---|---|
| Fall 2020 | NUP 350 | 137.5 | 0 | 137.5 | 4 |
| Spring 2021 | NUP 353 | 72 | 24 | 48 | 4 |
| Summer 2021 | NUP 410 | 120 | 0 | 120 | 3 |

*Id.* ¶ 40.

In November 2021, Reynolds filed this lawsuit on behalf of herself and a proposed class of all individuals enrolled in Concordia's ABSN program "who paid tuition and fees to Concordia" during the largest period allowed by law. *Id.* ¶¶ 84–85. Reynolds asserts common law claims for breach of contract, unjust enrichment, promissory estoppel, negligent misrepresentation, and reckless misrepresentation. *Id.* ¶¶ 98–133. In a sixth count, Reynolds asserts claims under Oregon's Unlawful Trade Practices Act, Or. Rev. Stat. § 646.605, *et seq.*, on behalf of herself and a proposed subclass of Portland ABSN students who paid tuition and fees to Concordia during the largest period allowed by law. *Id.* ¶¶ 86–87, 134–42. Reynolds seeks damages and injunctive relief requiring Concordia

to "provide truthful information" on its websites and in student handbooks and preventing "Concordia from retaining and/or charging tuition and fees for services it does not provide or benefits that students do not receive." *Id.* at 42–43 ¶¶ b–f.

## II

Concordia advances one purely jurisdictional contention: it argues that Reynolds lacks Article III standing to pursue the injunctive relief she seeks in the Complaint. Concordia points out that Reynolds "brought her complaint during the Fall 2021 semester, which was her fourth and final semester in the ABSN degree program before graduation." Mem. in Supp. [ECF No. 22] at 48.  Having graduated, Concordia argues, Reynolds does not (and cannot) plausibly allege a threat of ongoing or future harm necessary to obtain injunctive relief.  *Id.*  Reynolds counters that standing is "determined as of the date of the complaint" and that denying her standing to seek injunctive relief runs contrary to public policy.  Mem. in Opp'n [ECF No. 27] at 57–59.

"Federal jurisdiction is limited by Article III, § 2 of the U.S. Constitution to actual cases and controversies."  *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000).  "To show Article III standing, a plaintiff has the burden of proving: (1) that he or she suffered an 'injury-in-fact,' (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision."  *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  "[S]tanding is based on the facts as they existed [when] the lawsuit was filed," *id.* at 893, and "must exist not only [then], but through all stages of the litigation," *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013) (cleaned up).  "In the case of complaints for injunctive relief, the 'injury in fact' element

of standing requires a showing that the plaintiff faces a threat of ongoing or future harm." *Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000). This threat must be "real and immediate." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–04, 107 n.8 (1983). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Park*, 205 F.3d at 1037 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). Courts have dismissed claims for injunctive relief like those asserted here for lack of Article III standing based on a plaintiff's graduation. *See De León v. N.Y. Univ.*, No. 21 Civ 05005 (CM), 2022 WL 179812, at *6–7 (S.D.N.Y. Jan. 20, 2022).

Reynolds has not plausibly alleged a threat of ongoing or future harm. The injury Reynolds alleges is Concordia's retention of past tuition and fee payments for services she did not receive—*i.e.*, the benefit of her bargain—and perhaps other damages. Though Reynolds was enrolled in the ABSN program when she filed this suit, she has since completed the program and graduated. *See* Mem. in Opp'n at 57–58; *see also* ECF No. 1-1 (pre-registering Reynolds for 59 credits of coursework over four semesters through "Fall 2021"); Compl. ¶ 42 (alleging that the ABSN program is "comprised of 59 or 60 credit hours over four consecutive, full-time semesters" and is "completed in 16 months"). Reynolds does not allege any facts suggesting that she may enroll at Concordia at some future date. She does not allege, for example, that she intends to resume taking classes through Concordia's ABSN or another similar program. There is no real and immediate threat, in other words, that Reynolds will be at risk of suffering an injury she identifies in

this case.  She does not plausibly allege any other way she might be harmed in the future by Concordia's alleged misstatements and retention of tuition and fee payments.

Reynolds's arguments on this issue are not persuasive.  She's right that standing must be established by facts existent when an action commences, but standing must also "exist . . . through all stages of the litigation."  *Already, LLC*, 568 U.S. at 90–91 (cleaned up).  Public policy cannot trump the constitutional mandate that threat of future harm be real and immediate, which, at this stage, requires "*some* plausible prospect of future interaction between [p]laintiffs and [d]efendants," *Barclay v. ICON Health & Fitness, Inc.*, No. 19-cv-2970 (ECT/DTS), 2020 WL 6083704, at \*5 (D. Minn. Oct. 15, 2020) (summarizing split of authority and rejecting same public-policy argument).  Reynolds lacks Article III standing to seek her requested injunctive relief, and her claims—insofar as they seek injunctive relief—will be dismissed for lack of subject-matter jurisdiction.

### III

Concordia argues that any claims related to the St. Paul, Minnesota campus should be dismissed, either because Reynolds lacks standing, having not "allege[d] that she suffered any injury related to that program" (a jurisdictional problem), or because she does not "allege[] any facts relevant to the delivery of clinical education in the St. Paul program" (a merits problem).  Mem. in Supp. at 47–48; Reply Mem. [ECF No. 28] at 13.  Reynolds disagrees, arguing that her Complaint's "factual underpinnings regarding [Concordia]'s conduct concern the entirety of [the] ABSN program, not just one of two campuses," and that Concordia is really making a "mistimed challenge" to class certification.  Mem. in Opp'n at 55–56.

Whether considered under Rule 12(b)(1) or Rule 12(b)(6), Concordia's arguments on this point are not persuasive.  It is true that Reynolds has alleged many facts about her experiences as an ABSN student at the Portland campus.  But she's also alleged facts about Concordia's administration of the ABSN program that are common to students enrolled at both campuses.  As far as Reynolds's claims are concerned, Concordia's ABSN curricula "do[es] not materially differ" between its St. Paul and Portland campuses.  Compl. ¶ 4. Concordia made the same or substantially similar curricular promises and misrepresentations to students enrolled in the St. Paul ABSN programs.  For example, course descriptions in the Summer 2020 Handbook described the St. Paul ABSN curriculum to include several courses with "clinical," "simulation," and "skills lab" components.  ECF No. 1-2 at 54–61.  Reynolds alleges that Concordia made other representations about the curricular experiences offered in the ABSN program that either were not limited to the Portland campus or that explicitly referenced the St. Paul campus, that it curtailed or "completely eliminat[ed]" those experiences, and that it collected tuition and fees from students at both campuses in exchange for those experiences.  Compl. ¶ 66. These allegations plausibly connect Reynolds's claims to Concordia's St. Paul campus, and that is enough for now.

## IV

In reviewing a motion to dismiss for failure to state a claim, a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *Gorog*, 760 F.3d at 792 (citation omitted).  Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the

speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A

Concordia's Rule 12(b)(6) motion raises a choice-of-law problem. This issue has not been the subject of thorough briefing. In its opening brief, Concordia took the position that Oregon's substantive law governs each of Reynolds's claims, though it conducted no choice-of-law analysis. Mem. in Supp. at 18 n.15. In her response, Reynolds asserted that, as the forum state, Minnesota's substantive law should govern by default. Reynolds did not support this contention with a choice-of-law analysis, however. Mem. in Opp'n at 17. No doubt constrained by the word-count limit of LR 7.1(f), Concordia's reply included a terse choice-of-law analysis identifying four conflicts between Oregon and Minnesota law and arguing that Oregon law should govern Reynolds's claims. Reply Mem. at 2–3.

"The Supreme Court has held an individualized choice-of-law analysis must be applied to each plaintiff's claim in a class action." *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1120 (8th Cir. 2005) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 822–23 (1985)). "In a diversity case, a federal court applies the choice of law rules of the forum state." *Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1393 (8th Cir. 1997). Courts in Minnesota follow a three-step process to answer choice-of-law questions. "[T]he first consideration is whether the choice of one state's law over another's creates an

12

actual conflict." *Jepson v. Gen. Cas. Co. of Wisc.*, 513 N.W.2d 467, 469 (Minn. 1994).  If a conflict exists, the next question is "whether the law of both states can be constitutionally applied"—*i.e.*, whether each state has "a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Id.* at 469–70 (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312–13 (1981)).  If the answer to both questions is "yes," then five "choice influencing factors" are applied to decide which state's law should apply. *Id.* at 470.  At step one, "[a] conflict exists if the choice of one forum's law over the other will determine the outcome of the case." *Nodak Mut. Ins. Co. v. Am. Fam. Mut. Ins. Co.*, 604 N.W.2d 91, 94 (Minn. 2000).

Concordia identifies four substantive conflicts between Minnesota and Oregon law that implicate Reynolds's breach of contract, unjust enrichment, and negligent misrepresentation claims.  Concordia asserts that Oregon law differs in that it "1) does not permit statements in promotional materials to establish the terms of a contract; 2) requires pleading bad faith with respect to a breach of a student-university contract; 3) requires specification of an established legal category of unjust enrichment; and 4) requires a special relationship to sustain a claim for negligent misrepresentation." Reply Mem. at 3 (internal citations omitted).  Reynolds does not address these purported conflicts in depth, but she does assert that Oregon allows "terms contained in publications that the university provides to the student" to form contractual promises, Mem. in Opp'n at 19 (cleaned up), that her breach-of-contract claim does not require a showing of bad faith under Oregon law, *id.* at

27 n.11, and that there is no conflict as to her negligent misrepresentation claim, *id.* at 36 n.14.

(1) Begin with the first conflict Concordia identifies: whether materials a university provides to students may establish contractual terms. The parties agree that, under Minnesota law, they can. *See, e.g.*, *Huson v. Benilde-St. Margaret's Sch.*, A18-0317, 2018 WL 4401726, at *3 (Minn. Ct. App. Sept. 17, 2018) ("[W]e have recognized that a student may assert a breach-of-contract claim against a private educational institution when a private school fails to provide 'specifically promised educational services' it describes in its promotional materials.'" (quoting *Alsides v. Brown Inst., Ltd.*, 592 N.W.2d 468, 472–74 (Minn. Ct. App. 1999))). Concordia concedes that, under Oregon law, "[s]tatements in course catalogs, student handbooks, and similar documents may establish the terms of the contractual agreement." Mem. in Supp. at 19–20. Concordia argues, however, that Oregon law "does not permit statements in promotional materials to establish the terms of a contract." Reply Mem. at 3. This is incorrect. Like Minnesota, "Oregon law recognizes that a student and a private university may have a contractual relationship based on the terms contained in publications that the university provides to the student." *Dauven v. George Fox Univ.*, No. CV. 09-305-PK, 2010 WL 6089077, at *16 (D. Or. Dec. 3, 2010) (citing *Tate v. N. Pac. Coll.*, 70 Or. 160, 165 (1914)), *report and recommendation adopted*, 2011 WL 901026 (D. Or. Mar. 15, 2011). "Statements in course catalogs, student handbooks, and similar documents can establish the terms of a contractual agreement." *Gallagher v. Capella Educ. Co.*, No. 3:19-cv-01342-JR, 2019 WL 8333532, at *4 (D. Or. Dec. 23, 2019) (quoting *Vego v. Portland Pub. Sch.*, 204 F. Supp. 3d 1149, 1175 (D. Or.

14

2016), *rev'd in part on other grounds*, 737 F. App'x. 309 (9th Cir. 2018)); *see Breyer v. Pac. Univ.*, No. 3:17-cv-0036-AC, 2017 WL 3429395, at *4 (D. Or. Aug. 9, 2017) (same); *Bird v. Lewis & Clark Coll.*, 104 F. Supp. 2d 1271, 1276 (D. Or. May 24, 2000) ("The catalogs, bulletins, circulars, and regulations of the institution made available to the matriculant became part of the contract.") (cleaned up), *cited by Pranger v. Or. State Univ.*, No. 3:21-cv-00656 HZ, 2022 WL 214629, at *5 (D. Or. Jan. 25, 2022).  Here, Reynolds alleges that relevant terms of her contractual relationship with Concordia "are found in the handbooks, syllabi, registration forms, course catalogues, and other materials provided to [her] and class members prior to enrollment and re-enrollment in the ABSN program." Compl. ¶ 99.  Given Minnesota and Oregon's shared recognition that these documents may establish contractual terms between a university and student, Concordia has not shown a conflict on this issue.

(2) Concordia asserts that Oregon law requires pleading bad faith or arbitrariness to state a claim for breach of an educational contract, and that Minnesota law does not. Reynolds's position is that neither forum imposes such a requirement for her claims.  Mem. in Opp'n at 27–28.  Reynolds is right.  Oregon's so-called "educational malpractice" doctrine does not apply here.  It's true that, "[u]nder Oregon law, a court can review a university's academic decisions related to student conduct and educational requirements only if that decision was made arbitrarily or in bad faith." *Pranger*, 2022 WL 214629, at *3.  But "[n]ot every decision made by a university . . . falls under the educational malpractice doctrine: [C]ontract-based or alternatively plead equitable claims typically fall outside the educational malpractice doctrine if they do not necessitate court scrutiny of the

faculty's discretionary decision-making in rendering grades and degrees." *Id.* (quoting *Gallagher*, 2019 WL 8333532, at \*4). Thus, the educational malpractice doctrine does not bar claims that an institution failed to perform on specific promises. *Gallagher*, 2019 WL 8333532, at \*4 (citing *Wright v. Capella Univ., Inc.*, 378 F. Supp. 3d 769, 771 (D. Minn. 2019)). Here, Reynolds does not seek an assessment of the quality of education she received or to second-guess Concordia's decision-making in assigning grades or degrees. She claims to have paid tuition and fees in exchange for curricular experiences and services she was promised but did not receive. Thus, Reynolds need not plead bad faith or arbitrariness under Oregon law. *See Pranger*, 2022 WL 214629, at \*4 (collecting similar "COVID-19 tuition refund" cases).

(3) Concordia says that Oregon law differs by limiting unjust enrichment claims to "established legal categories of unjust enrichment as reflected in Oregon case law and other authorities," including the *Restatement (Third) of Restitution and Unjust Enrichment*. *Larisa's Home Care, LLC v. Nichols-Shields*, 404 P.3d 912, 919–20 (Or. 2017); *Hoag Living Tr. v. Hoag*, 424 P.3d 731, 738 (Or. Ct. App. 2018). Minnesota law does not impose this same requirement explicitly. Practical considerations nonetheless favor concluding that this issue is not outcome determinative. Concordia acknowledges that "there are at least 44 categories" of unjust enrichment to choose from under the *Restatement*—and that's "not including any categories established in Oregon caselaw." Mem. in Supp. at 30 n.21. Considering the Complaint's factual allegations, there's no realistic doubt Reynolds could amend her complaint and fulfill this requirement by identifying one or more of those categories. *See, e.g.*, *Larisa's Home Care, LLC*, 404 P.3d at 921–22 (quoting Restatement

16

(Third) of Restitution and Unjust Enrichment § 13(1) ("A transfer induced by fraud or material misrepresentation is subject to rescission and restitution.")).  Once that happens, the next practical consideration is whether whatever category Reynolds identifies under Oregon law is sufficient to plead an unjust enrichment claim under Minnesota law.  In other words, it has not been shown that Oregon's "established legal category" rule for unjust enrichment claims creates an outcome determinative conflict with Minnesota law here.

(4) Concordia asserts that Oregon law differs from Minnesota law by requiring a "special relationship" between the parties to sustain a claim of negligent misrepresentation. Reply Mem. at 3.  Not so.  Oregon and Minnesota courts follow the widely accepted rule that recovering for negligent misrepresentation requires establishing a duty of care owed by the person making the representation to one who relies on it.  *Compare Onita Pac. Corp. v. Trs. of Bronson*, 843 P.2d 890, 896–900 (Or. 1992), *with Williams v. Smith*, 820 N.W.2d 807, 816–17 (Minn. 2012).  Under each forum's law, establishing a duty between parties to a commercial transaction is a contextual inquiry that requires showing something more—*i.e.*, that the parties shared a "special relationship," such as a professional one in which the claimant authorized and relied on another to pursue its interests or exercise independent judgment on its behalf; or, put differently, that the transaction was not truly "arm's-length" in nature.  *Compare Williams*, 820 N.W.2d at 821 n.5 ("We have not recognized a duty of care in the absence of either superior knowledge or a special relationship, particularly in the context of sophisticated parties who are experienced at negotiating the transaction at issue."), *and Blue Cross & Blue Shield of N.C. v. Rite Aid Corp.*, 519 F. Supp. 3d 522, 543–44 (D. Minn. 2021) (summarizing Minnesota caselaw

and concluding that, under it, "no duty exists between parties to an 'arm's-length commercial transaction'"), *with Conway v. Pac. Univ.*, 924 P.2d 818, 821–26 (Or. 1996) (en banc) (observing that negligent misrepresentation claim is "not actionable" in arm's-length transaction and discussing "special relationship" standard in context of claims by professor against his employer university), *and Austin v. Univ. of Or.*, 205 F. Supp. 3d 1214, 1229 (D. Or. 2016) (finding no special relationship arose from "arm's length relationship intent on securing divergent rather than joint interests").

\*

Because Concordia has not shown an outcome determinative conflict between Oregon and Minnesota's substantive law, Minnesota's substantive law will be applied to Reynolds's common law claims. *See, e.g.*, *Minn. Pipe & Equip. Co. v. Ameron Int'l Corp.*, 938 F. Supp. 2d 862, 871 (D. Minn. 2013) ("If the Court concludes that there is no actual conflict between the laws of two states, the inquiry proceeds no further and the Court applies the law of the forum."); *accord Davis by Davis v. Outboard Marine Corp.*, 415 N.W.2d 719, 723 (Minn. Ct. App. 1987), *rev. denied*, (Minn. Jan. 28, 1988).[3]

---

[3]    The Parties do not address what Minnesota's choice-of-law principles say about Reynolds's claims under Oregon's Uniform Trade Practices Act, but for several reasons it seems appropriate just to consider these claims on their merits. The Parties have identified no conflict between Reynolds's claims under this statute and an analogous Minnesota statute, and none is obvious. Neither party suggests it's wrong to consider the merits of Reynolds's Oregon statutory claims without conducting a conflict-of-law analysis. It's not as if there is no connection between Reynolds and these claims. The Complaint's allegations plausibly establish that Oregon has "a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1120–21 (8th Cir. 2005) (quoting *Allstate Ins.*, 449 U.S. at 312–13). Oregon is Reynolds's state of residence. It is where Concordia maintains a campus and offers the ABSN program in

18

B

1

In Count I, Reynolds alleges that Concordia breached various contractual promises to "provide specific onsite, in-person education through simulated and/or clinical settings." Compl. ¶¶ 100, 102.  Reynolds alleges that these contractual obligations arose from "handbooks, syllabi, registration forms, course catalogues, and other materials provided to [her] and class members prior to enrollment and re-enrollment in the ABSN program." *Id.* ¶ 99.

Under Minnesota law, the elements of a breach-of-contract claim are "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011).  "Minnesota has rejected a 'rigid importation of contractual doctrine' into the student-university relationship." *Shank v. Carleton Coll.*, 232 F. Supp. 3d 1100, 1116 (D. Minn. 2017) (quoting *Abbariao v. Hamline Univ. Sch. of Law*, 258 N.W.2d 108, 113 (Minn. 1977)).  "The catalogs, bulletins, circulars, and institution regulations given to the student [may] form part of the contract." *Alsides*, 592 N.W.2d at 472 (citation omitted).  "[A] student may bring an action against an educational institution for breach of contract . . . if [1] it is alleged that the institution failed to perform on specific promises it made to the student and [2] the claim

---

which Reynolds enrolled and where Reynolds suffered her alleged economic harm. Finally, as will be discussed below, a conflicts analysis isn't necessary because Reynolds has not plausibly stated her claims under the Oregon Uniform Trade Practices Act.

would not involve an inquiry into the nuances of educational processes and theories." *Id.* at 473 (cleaned up). "Cases involving nuances of education theory or procedures tend to involve claims of ineffective teaching or educational malpractice." *Smith v. Argosy Educ. Grp., Inc.*, No. A08-0222, 2008 WL 4977598, at *1 (Minn. Ct. App. Nov. 25, 2008). "To distinguish between nonactionable claims of educational malpractice and actionable breach-of-contract claims, 'the essence of the plaintiff's complaint [must] not be that the institution failed to perform adequately a promised educational service, but rather that it failed to perform that service at all.'" *Trennepohl v. DeLaSalle High Sch.*, No. A20-0437, 2020 WL 6554847, at *2 (Minn. Ct. App. Nov. 9, 2020) (citation omitted).

Reynolds's contract claim does not require inquiry into nuances of educational processes or theories.[4]  As discussed, her contract theory is not one calling for an assessment of the quality of education she received—*i.e.*, that Concordia "failed to perform adequately a promised educational service"—but that it failed to perform a service at all. *Trennepohl*, 2020 WL 6554847, at *2.  Reynolds alleges to have paid tuition and fees in exchange for in-person clinical, lab simulation, and other curricular experiences she was promised but did not receive. *See Alsides*, 592 N.W.2d at 472–74 & n.3; *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414, 425 (S.D.N.Y. 2021); *Saroya v. Univ. of the Pac.*, 503 F. Supp. 3d 986, 995–96 (N.D. Cal. 2020).

---

[4]      Concordia is fairly understood to challenge this element.  Concordia did not brief Reynolds's contract claim under Minnesota law, but it does make an equivalent Oregon-law argument by asserting that Reynolds must allege arbitrariness or bad faith— something that would only be true were she seeking review of "academic decisions related to student conduct [or] educational requirements." *Pranger*, 2022 WL 214629, at *3.

Concordia argues that Reynolds has not identified a specific promise to an "in-person clinical education" in the materials she cites. Concordia also argues that some of the documents on which Reynolds relies contained "express language confirming Concordia's discretion and right to make changes in providing [her] instruction," such as contractual disclaimers and reservations of rights. Mem. in Supp. at 19–23; Reply Mem. at 4–5. At this stage, neither argument is persuasive.

Reynolds has identified sufficiently specific promises by Concordia. She points to Concordia's statements concerning both the form and amount of instruction she would receive throughout the ABSN program. Start with statements in the Registration Authorization Form and the Summer 2020 Student Handbook, which "Concordia required [Reynolds] and class members to read and sign . . . as a condition of enrollment." Compl. ¶¶ 68, 51. Concordia represented in the Summer 2020 Student Handbook that:

- "The hybrid Accelerated BSN program follows a blended learning model comprising online nursing theory coursework, *hands-on experiential learning in our nursing simulation labs in Portland and real-world clinical practice in local health care facilities*." ECF No. 1-2 at 10 (emphasis added).

- "Lab learning and simulation experiences provide nursing students with learning opportunities which complement didactic learning in the development of critical thinking." *Id.* at 36.

- "Clinical and Simulation learning activities are based on course objectives outlined by the curriculum committee, overall, and lead faculty for each didactic course as each clinical and simulation student group is tied to a specific didactic course. Lab and simulation faculty develop lab and simulation content that align with all leveled course outcomes. All lab and simulation activities will be vetted by content

experts using documented evidence based practice standards." *Id.*

- "Open lab time for supervised practice will be scheduled on an 'as needed' basis." *Id.*

- "Students will be required to attend clinical at multiple sites and are required to have reliable transportation.  CSP aims to obtain clinical opportunities within 60 miles from the respective CSP campus, but occasionally we must use clinical sites further away due to limited availability.  Clinical hours may occur during any shift—days, evenings, or nights—and any days of the week, including weekends, depending on clinical availability and student assignment." *Id.* at 44.

In describing courses that would be offered at its Portland campus and for which Reynolds registered—NUR 350, NUR 353, NUR 410, NUR 411, and NUR 413—Concordia made specific and repeated statements confirming that clinical and lab components would be offered.  *See* ECF No. 1-1 (authorizing Concordia to register Reynolds for those courses, and representing that those courses contained "clinical" and "lab" modalities); ECF No. 1-2 at 61 (stating that NUR 350 "has a clinical component"), at 61–62 (stating that NUR 353 "has a clinical component"), at 62 (stating that, in NUR 410, "[e]vidence based practice in maternity, newborn and pediatric care is examined in the classroom, on-campus clinical (lab) that includes pediatric and obstetric assessment and nursing procedures, and in clinical practice in varied healthcare settings"), at 62 (stating that NUR 411 "includes accompanying clinical component"), at 63 (stating that, in NUR 413, "[s]tudents will be immersed in the professional practice role during an accompanying 200-hour preceptored clinical component").  Concordia made substantially similar statements in the Summer 2021 Handbook, which it required Reynolds to sign "before re-enrolling for the Summer

2021 semester," Compl. ¶¶ 78–80; *see* ECF No. 1-6; in webpages that Reynolds viewed before and during her enrollment, Compl. ¶¶ 54–61, 63–65; and in course syllabi, ECF Nos. 1-3, 1-5, 1-7, 1-8.[5]   Certainly in this Rule 12(b)(6) context, these statements are plausibly construed as sufficiently specific promises by Concordia that, in exchange for tuition, Reynolds would receive clinical, simulation, and lab experiences through the ABSN curriculum.  *See Alsides*, 592 N.W.2d at 473–74 & n.3; *see also Pranger*, 2022 WL 214629, at *5–6.

Concordia argues that Reynolds's contract claim is implausible due to contractual disclaimer and reservation of rights language found in certain of its promotional materials. This argument relies on at least three documents and their interplay.  Concordia's Student Policies Handbook states that Concordia "reserves the right to amend or deviate from the

---

[5]     Unanswered legal and factual questions could limit which materials—and consequently, what promises—defined the parties' contractual relationship.  When, for instance, was the parties' contract formed?  Did formation occur when Reynolds registered and enrolled in the ABSN program, when she paid tuition, or at some other time?  Was a separate contract formed each time Reynolds paid tuition or when Concordia made her re-enroll before the Summer 2021 semester?  Which of the cited educational materials did Reynolds receive before contract formation?  The parties have not briefed these questions, making it unwise to attempt to answer them now.  For the time being, Reynolds's allegations plausibly show that she relied on statements in various materials Concordia gave her before she enrolled in, registered, and paid for the ABSN program, and that those documents formed part of the parties' contractual relationship.  *See* Compl. ¶ 28 (alleging that Reynolds "applied for, accepted enrollment in the ABSN program, and paid tuition and fees" based on "her review of Concordia's website, orientation materials, registration form, course schedules and syllabus, communications from Concordia's agents, and the student handbook"), ¶ 99 ("The terms of such contracts are found in the handbooks, syllabi, registration forms, course catalogues, and other materials provided to Plaintiff and class members prior to enrollment and re-enrollment in the ABSN program.").

policies or portions of the Student Policies Handbook at its discretion." ECF No. 23-8 at

3. Also, Concordia's then-operative Academic Catalogs stated that:

> the information in this catalog does not constitute a contract
> between Concordia University and the student. The material
> contained in this catalog is for information only. The
> university reserves the right to make changes in curricula,
> admissions policies and processes, tuition and financial aid,
> academic standards and guidelines, student services and any
> other regulations or policies set forth in this catalog without
> giving prior notice.

ECF No. 23-1 at 8, 28; ECF No. 23-2 at 8, 29. From there, Concordia highlights that its

Student Handbooks, which Reynolds relies on, are "a supplement to the Concordia

University Saint Paul (CSP) Academic Catalog, and Student Policies Handbook." ECF

No. 1-2 at 6; ECF No. 1-6 at 6. So, Concordia's argument goes, because the Student

Handbooks were a supplement to materials containing a disclaimer, they did not give rise

to contractual obligations, and, in any case, Concordia reserved the right to change its

curricula.

Under Minnesota law, the "cardinal purpose" in construing contracts is

"ascertain[ing] the intention of the parties from the language used by them and by a

construction of the entire instrument." *Hall v. City of Plainview*, 954 N.W.2d 254, 266

(Minn. 2021). Courts should "interpret a contract so as to give effect to all of its

provisions." *Metro. Airports Comm'n v. Noble*, 763 N.W.2d 639, 645 (Minn. 2009). "The

determination of whether a contract is ambiguous is a question of law, but the interpretation

of an ambiguous contract is a question of fact for the jury." *Denelsbeck v. Wells Fargo &*

*Co.*, 666 N.W.2d 339, 346 (Minn. 2003) (internal citation omitted). "The terms of a

contract are ambiguous if they are susceptible to more than one reasonable interpretation." *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018).

In *City of Plainview*, the Minnesota Supreme Court considered the meaning of two disclaimers in an employee handbook, asking "whether a general disclaimer . . . stating that the provisions of the handbook are not intended to create a contract necessarily defeats the formation of a contract for every provision in the handbook." 954 N.W.2d at 262. One disclaimer stated that the handbook was "not intended to create an express or implied contract of employment." The court found that, read contextually, this disclaimer aimed merely to "preserv[e] the [employer]'s ability to terminate an employee at its sole discretion," and nothing more. *Id.* at 265–66. A "second, more general" disclaimer stated that "[t]he purpose of these policies is to establish a uniform and equitable system of personnel administration for employees . . . . They should not be construed as contract terms." *Id.* at 266. The court found this disclaimer "ambiguous" as to the employer's paid time off policy, reasoning that the disclaimer was "general, lack[ed] precision, and most importantly," the employer's broad reading was "internally inconsistent," creating a "conflict with the detailed and concrete explanation of [a] unilaterally imposed policy to compensate employees who ha[d] performed work . . . with accrued PTO when their employment end[ed]." *Id.* at 266–67. Given this ambiguity, "the question of the impact of the Handbook's general disclaimer on [the plaintiff]'s claim [was] for a fact-finder to determine." *Id.* at 267.

Courts in pandemic tuition-refund lawsuits have, like *City of Plainview*, generally found ambiguity in broad contractual disclaimers and reservation of rights language that walk back specific and repeated promises by universities—particularly when those promises form a core purpose of the relationship. *See Montesano v. Catholic Univ. of Am.*, 548 F. Supp. 3d 6, 10 (D.D.C. 2021) ("It likely would be unreasonable, for example, to interpret the reservation clauses so broadly as to permit the universities to decide in the middle of a semester to remove all professors and impose a model of self-directed learning. The reservations of rights clearly permit the universities to make some changes to course programming and educational services. Yet certain assumptions of the broader implied contract between the universities and their students are so fundamental that the reservations of rights cannot reasonably be interpreted to waive them.").[6]

The Complaint's allegations plausibly show that the disclaimer and reservation of rights language in the Academic Catalogs and Student Policies Handbook are ambiguous as applied to the parties' contractual relationship and do not render Reynolds's contract claim implausible. A reasonable person could decide those provisions did not allow Concordia to eliminate (entirely or partially) in-person clinical, simulation, or other

---

[6]     *See also Shaffer v. George Wash. Univ.*, 27 F.4th 754, 764–65 (D.C. Cir. 2022); *Ninivaggi v. Univ. of Del.*, 555 F. Supp. 3d 44, 51–52 (D. Del. Aug. 2021); *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d at 424–25; *Warner v. Wartburg Coll.*, 21-cv-2029-CJW-MAR, 2021 WL 3276375, at *8–9 (N.D. Iowa July 30, 2021); *Miranda v. Xavier Univ.*, No. 1:20-CV-539, 2022 WL 899668, at *5 (S.D. Ohio Mar. 28, 2022); *Omori v. Brandeis Univ.*, 533 F. Supp. 3d 49, 55 (D. Mass. 2021); *Hiatt v. Brigham Young Univ.*, 512 F. Supp. 3d 1180, 1185–86 (D. Utah 2021). *But see Mitelberg v. Stevens Inst. of Tech.*, 2021 WL 2103265, at *4 (D.N.J. Mar 25, 2021); *Dougherty v. Drew Univ.*, 534 F. Supp. 3d 363, 377–78 (D.N.J. 2021); *Lindner v. Occidental Coll.*, No. CV 20-8481-JFW(RAOx), 2020 WL 7350212, at *8 (C.D. Cal. Dec. 11, 2020).

experiences it promised. These were more than vague or implied representations that instruction would take place in a campus classroom; the promised experiences plausibly formed a core component of the nursing program in which Reynolds enrolled. Concordia's statements about clinical and lab experiences to Reynolds were repeated, and they identified discrete modes and quantities of clinical and lab instruction. A reasonable person could conclude that a broad reading of Concordia's ability to "make changes in curricula, admissions policies and processes, tuition and financial aid, academic standards and guidelines, student services and any other regulations or policies set forth in [its] catalog" breeds inconsistency among documents forming its contractual relationship with Reynolds and therefore did not confer a right to so drastically change the ABSN program. A reasonable person could reach the same conclusion about the Academic Catalogs' contractual disclaimer and Concordia's ability to "amend or deviate from the policies or portions" of the Student Policies Book. *See City of Plainview*, 954 N.W.2d at 266–67. Finally, each clause that Concordia relies on was found in a separate, voluminous document. It's true the Student Handbooks were described to "supplement" those documents, but there is room for reasonable debate over the extent to which the disclaimer and reservation of rights covered the Student Handbook and other materials that Reynolds relies on. *See* ECF No. 23-8 at 3 (reserving right to "amend or deviate from the policies or portions *of the Student Policies Handbook*") (emphasis added); ECF No. 23-1 at 8, 28; ECF No. 23-2 at 9, 29 (stating that "*this catalog* does not constitute a contract" and that "material *in this catalog* is for information only") (emphasis added).

Concordia argues that Reynolds has not alleged "cognizable damages." Calculating Reynolds's damages, Concordia says, would require "a detailed examination comparing (and speculating on) different methodologies of nursing education." Mem. in Supp. at 28. This argument is not persuasive.[7]  Reynolds has identified something she was promised and did not receive—clinical, simulation, and other in-person instruction. How precisely to measure the value of those services is unclear at this stage, but that's of no consequence. "These experiences were clearly valuable, regardless of whether they were *necessary* to become a nurse." *Miranda*, 2022 WL 899668, at *6. Reynolds does more than challenge her school's transition to online instruction during a pandemic. Reynolds alleges a promise and failure to deliver discrete forms of instruction that formed a fundamental component of the nursing program she enrolled in. Concordia described them as such, conditioning a student's passage on successful completion of "clinical/simulation hours." Compl. ¶ 48; *see also id.* ¶¶ 61, 65 ("Unlike with may professions—where you don't get real-life work experience until starting your first job—it is essential that you receive actual clinical experience as part of your nursing education."); *id.* ¶ 60 (similar); ECF No. 1-2 at 28 (stating, as part of "Clinical Attendance Policy," that "[m]issing two days of clinical will result in a grade of F for the course"). In sum, Reynolds has plausibly alleged contractual

---

[7]     As Reynolds notes, there is uncertainty over whether damages are a necessary pleading element for breach of contract claims under Minnesota law. *See Park Nicollet Clinic*, 808 N.W.2d at 833 n.5 ("We have recognized that the plaintiff may not have to allege that the breach caused damages in order to state a claim for breach of contract.").

damages.[8]  *See also Shaffer*, 27 F.4th at 765; *Rhodes v. Embry-Riddle Aeronautical Univ., Inc.*, 513 F. Supp. 3d 1350, 1358 (M.D. Fla. 2021).

Last, Concordia argues that Reynolds has not plausibly alleged it breached the Parties' agreement by collecting fees.  Concordia asserts that, although Reynolds "implies" Concordia used fees for other purposes, she stops short of alleging that Concordia's need for "consumables and resources" dissipated with its transition to remote instruction.  Mem. in Supp. at 28–29; Reply Mem. at 7–8.

Drawing all reasonable inferences in her favor, Reynolds has plausibly alleged that Concordia failed to provide materials it promised in exchange for her payment of an "ABSN Portland Course Fee."  Reynolds alleges Concordia collected ABSN Portland Course Fees to "support consumables and resources within courses and throughout programs (labs, simulations)."  Compl. ¶ 82 (quoting ECF No. 1-4 at 2).  She's attached to the Complaint a document listing the "estimated expenses" for ABSN students who, like her, began the Portland ABSN program in Fall 2020.  *See* ECF No. 1-4 at 3.  That document lists $660 in ABSN Portland Course Fees, including approximately "$120 within each course with a lab."  *Id.*  Reynolds alleges Concordia "retain[ed] the proceeds from these fees despite no longer needing the same amount of 'consumables and resources' for labs and simulations, which were moved online."  Compl. ¶ 82.  Concordia's "failure to provide [those] resources" caused Reynolds and other students to "use their own resources."  *Id.*

---

[8]     Relatedly, Concordia argues that Reynolds's contract claim "is not well-pled to the extent [she] alleges or implies she did not receive clinical hours required for nursing education under Oregon law."  Mem. in Supp. at 25–26.  Reynolds makes no such claim.

For example, Reynolds had to "practice hanging IV fluids on coat hangers." *Id.*  Reynolds alleges that she and others received "no cognizable benefit" from fees she paid because she "no longer receive[d] access to, or received less access to, clinical education settings or on-campus student activities." *Id.* ¶ 93.  These allegations plausibly establish Concordia's breach of its promise to provide lab materials in exchange for her payment of ABSN Portland Course Fees.  *Accord In re Columbia Tuition Refund Action*, 523 F. Supp. 3d at 426–27, 428; *Shaffer*, 27 F.4th at 766; *De León*, 2022 WL 179812, at *10–11; *Mitelberg*, 2021 WL 2103265, at *4; *Pranger*, 2022 WL 214629, at *6.

2

In Count II, Reynolds alleges a claim for unjust enrichment.  Concordia first argues that Reynolds's unjust enrichment claims should be dismissed as duplicative of her breach of contract claim.  Reynolds counters that she may plead her unjust enrichment claim in the alternative to her breach of contract claim, as she has done here.  *See* Compl. ¶ 104.

Under Minnesota law, plaintiffs cannot recover for unjust enrichment "when there is an enforceable contract that is applicable." *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012).  Under Fed. R. Civ. P. 8(d), however, a pleader may "state as many separate claims or defenses as it has, regardless of consistency."  Thus, breach-of-contract plaintiffs may plead quasi-contract claims alternatively when recovery on those claims is plausible, including when there are doubts over the existence, enforceability, or scope of a contract.  *E.g.*, *Moreno v. Wells Fargo Bank, N.A.*, No. 18-cv-2760 (PJS/DTS), 2019 WL 1438248, *7 (D. Minn. Apr. 1, 2019); *see also Restatement (Third) of Restitution and Unjust Enrichment* § 34 (Am. L. Inst. Mar. 2022

30

Update).  This rule has been applied in pandemic-era tuition-refund cases, owing to disputes over the scope of the university-student relationship and the prospect of pandemic-induced avoidance defenses, such as impossibility and impracticability.  *See Shaffer*, 27 F.4th at 769 (explaining legal possibility that "Universities promised to provide in-person education and services, but the need to comply with government shutdown orders discharged their duty to perform"); *Miranda*, 2022 WL 899668, at *8 (similar); *Ninivaggi*, 555 F.3d. at 52–53 (similar); *Hiatt*, 512 F. Supp. 3d at 1188 (similar); *Ford v. Rensselaer Polytechnic Inst.*, 507 F. Supp. 3d 406, 419–20 (N.D.N.Y. 2020) (similar).

Here, in line with Minnesota law and these cases, the better approach is to allow Reynolds to plead her unjust enrichment claim in the alternative.  It's too early to say that Concordia's alleged duties to perform were not discharged or shaped by the challenges of the COVID-19 pandemic, which could clear Reynolds's path to recovery on equitable grounds.  And, as noted already, discovery and fact development will better define the scope of contractual obligations owed by Concordia to Reynolds—particularly in this educational context, when the parties' relationship is not subject to "rigid . . . contractual doctrine."  *See supra*, Part IV.B.1.  Reynolds's unjust enrichment claim will not be dismissed as duplicative.

Concordia next argues it's not plausibly alleged to have been unjustly enriched. Mem. in Supp. at 33–35 ("[Reynolds] cannot show that is unfair for Concordia to retain the tuition and fees when she does not dispute that—in the face of a global pandemic and statewide disaster—Concordia continued to provide [her] a nursing education (continued at significant effort) and the ability to earn *uninterrupted* academic credits towards her

*accelerated* degree.").  Reynolds responds that the pandemic is no good excuse because the pandemic—and consequently, Concordia's "transition to online learning"—occurred before it made the alleged misrepresentations she relied on when enrolling in the ABSN program.  Mem. in Opp'n at 31–32.

"Under Minnesota law, 'to prevail on a claim of unjust enrichment, a claimant must establish an implied-in-law or quasi-contract in which the defendant received a benefit of value that unjustly enriched the defendant in a manner that is illegal or unlawful.'" *Ventura v. Kyle*, 825 F.3d 876, 887 (8th Cir. 2016) (quoting *Caldas*, 820 N.W.2d at 838).  "[T]he claimant must show that the defendant has knowingly received or obtained something of value for which the defendant 'in equity and good conscience' should pay." *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 306 (Minn. 1996) (quoting *Klass v. Twin City Fed. Sav. & Loan Ass'n*, 190 N.W.2d 493, 494–95 (Minn. 1971)).  Whether a benefit was inequitably retained often involves issues reserved for the trier of fact. *Goodbye Vanilla, LLC v. Aimia Proprietary Loyalty U.S. Inc.*, 304 F. Supp. 3d 815, 827 (D. Minn. 2018) (collecting cases).

Reynolds alleges facts plausibly showing that Concordia's retention of her tuition and fee payments was inequitable.  Reynolds enrolled in the ABSN program in July 2020, when the COVID-19 pandemic was already underway.  Compl. ¶ 30.  She paid tuition and fees to Concordia, "including in part on a credit-hour-by-credit-hour basis," to "avail [herself] of in-person and hands-on educational training and campus facilities." *Id.* ¶ 105. Concordia knowingly accepted and retained these payments "premised upon the existence of services it no longer provided or refused to provide." *Id.* ¶ 106.  Reynolds chose to

enroll "based on her review of Concordia's website, orientation materials, registration form, course schedules and syllabus, communications from Concordia's agents, and the student handbook—all of which included explicit references to lab and clinical in-person, hands on training she expected to receive." *Id.* ¶ 28. After she began the program, Concordia made statements affirming and re-affirming its intent and ability to provide the in-person clinical, simulation, and lab experiences described throughout its materials, but neither resumed offering those experiences as promised nor refunded Reynolds for her tuition and fee payments. These taken-as-true allegations permit the conclusion that Concordia retained something of value for which it in equity and good conscience should pay. *See, e.g.*, *Shaffer*, 27 F.4th 769–70; *In re Univ. of S. Cal. Tuition & Fees COVID-19 Refund Litig.*, No. CV 20-4066-DMG (PVCx), 2021 WL 3560783, at *8 (C.D. Cal. Aug. 6, 2021) (collecting cases). Concordia's motion to dismiss Count II will be denied.

3

In Count III, Reynolds asserts a claim for promissory estoppel. To recover on this claim, she must allege: (1) a clear and definite promise was made; (2) the promisor intended to induce reliance and the promisee in fact relied to his or her detriment; and (3) the promise must be enforced to prevent injustice. *Martens v. Minn. Min. & Mfg. Co.*, 616 N.W.2d 732, 746 (Minn. 2000). Promissory estoppel "impl[ies] a contract in law where none exists in fact." *Grouse v. Group Health Plan, Inc.*, 306 N.W.2d 114, 116 (Minn. 1981). Concordia argues this claim must be dismissed because (1) it's duplicative of Reynolds's breach-of-contract claim; (2) Reynolds has not alleged an unequivocal promise of in-

33

person clinical and simulation education; and (3) she has alleged neither reasonably foreseeable nor detrimental reliance.  Mem. in Supp. at 36–38.

Two of Concordia's arguments mirror those it made to dismiss other claims and fail for reasons discussed already.  First, as with her unjust enrichment claim, it's true that Reynolds may not recover for promissory estoppel if a valid contract governs her claims. *E.g.*, *Genz-Ryan Plumbing & Heating Co. v. Weyerhaeuser NR Co.*, 352 F. Supp. 3d 901, 904–06 (D. Minn. 2018).  Concordia does not argue this rule applies differently to Reynolds's promissory estoppel claim than it does to her unjust enrichment claim.  *See* Reply Mem. at 8.  Thus, because of uncertainty over the scope and enforceability contractual promises she alleges, Reynolds may plead her promissory estoppel claim in the alternative, and Concordia's argument to dismiss it as "duplicative" will be denied.  *See supra,* Part IV.B.2.  Second, deciding whether Reynolds alleges a "clear and definite" promise for promissory estoppel prompts a similar inquiry as deciding whether she alleges the "specific promise" required to plead a breach of contract claim by a student against an educational institution under Minnesota law.  The allegations of repeated written representations that support Reynolds's contract claim also support her promissory estoppel claim.  *See Femrite v. City of Lowry*, No. A13-2296, 2014 WL 5507009, at *7 (Minn. Ct. App. Nov. 3, 2014) (promise to pay specific sum "at some point in the future once [developer] finished its involvement in the project" was clear and definite); *Chester Creek Techs., Inc. v. Kessler*, No. A06-505, 2007 WL 3589, at *3 (Minn. Ct. App. Jan. 2, 2007) (emails and conversations, "in the aggregate," were sufficient to support jury's finding of promise not to interfere with asset-purchase efforts).

Concordia's remaining argument is that Reynolds's "alleged expectation of unchanged delivery of clinical education and simulations amid a public health crisis is not reasonably foreseeable," and that her reliance was not plausibly detrimental because she received the academic credits and degree that she bargained for.  Mem. in Supp. at 37–38.[9] "The second element of promissory estoppel is satisfied when the promisor should reasonably have expected to induce the promisee's reliance, and the promisee reasonably relies to its detriment."  *Heffron v. Burlington N. & Santa Fe. Ry. Co.*, No. A11-2039, 2012 WL 3262968, at *4 (Minn. Ct. App. Aug. 6, 2012); *accord Myrlie v. Countrywide Bank*, 775 F. Supp. 2d 1100, 1107 (D. Minn. 2011).  "The reasonableness of a party's reliance is a fact question for the jury [that is] not generally amenable to summary judgment." *Norwest Bank Minn., N.A. v. Midwestern Mach. Co.*, 481 N.W.2d 875, 880 (Minn. Ct. App. 1992) (citing *Brenner v. Nordby*, 306 N.W.2d 126, 127 (Minn. 1981)), *overruled on other grounds by Figgins v. Wilcox*, 879 N.W.2d 653 (Minn. 2016).  "Moreover, the degree of the promisee's reliance on the promise must be reasonable; we must ask 'to what degree and to what aspects of the promise has there been reasonable reliance.'"  *Meriweather Minn. Land & Timber, LLC v. State*, 818 N.W.2d 557, 567 (Minn. Ct. App. 2012) (quoting *Christensen v. Minneapolis Mut. Emps. Ret. Bd.*, 331 N.W.2d 740, 749 (Minn. 1983)).

Here, the allegations permit the plausible inference that Reynolds reasonably relied on Concordia's representations and did so her to detriment.  Despite paying full tuition and fees, Reynolds alleges she did not receive the benefit of her bargain: "hands on learning

---

[9]     In its reply, Concordia claims Reynolds has "failed to address" its reliance argument.  Reply Mem. at 9.  That's not right.  *See* Mem. in Opp'n at 35–36.

experiences in simulated and/or clinical settings." Compl. ¶¶ 114–15. She need not allege that she was deprived of academic credits or a degree. *See, e.g.*, *Miranda*, 2022 WL 899668, at *6. She's also alleged facts allowing the conclusion that her reliance was reasonable. Reynolds pre-registered for coursework in July 2020, after the pandemic had begun. Compl. ¶ 30. By this time, as Concordia points out, Oregon Governor Kate Brown had declared a state of emergency and suspended in-person learning at Oregon colleges and universities—but she also granted them an exemption "for the purpose of providing clinical, laboratory, or other in-person instruction associated with completion of health care-related certificate, license or degree" when "no remote or online alternative [was] practicable." Mem. in Supp. at 14 (citing Executive Order No. 20-09). Thus, when Reynolds enrolled, it was not unrealistic to expect that Concordia would deliver Portland ABSN students the in-person clinical and lab experiences that it said it would. Meanwhile, Concordia continued to promise in-person experiences into the Fall 2020 semester. Compl. ¶¶ 15–16. In September 2020, Governor Brown permitted colleges and universities to resume in-person instruction subject to health and safety restrictions. Mem. in Supp. at 14 (citing Executive Order No. 20-28). Concordia acknowledged the pandemic but misrepresented in blog posts that it had resumed "skills labs and clinical simulations," when this was allegedly not the case. Compl. ¶ 75 ("You might be wondering what measures CSP has taken to ensure the safety of its faculty and students, in light of the recent pandemic. For the fall 2020 semester, students and faculty resumed skills labs and clinical simulations, but at 50% of typical frequency."). When Concordia resumed offering some in-person experiences in 2021, it did so on a limited basis, did not explain the "lottery"

system it implemented, and did not acknowledge that it would continue to fall short on the originally promised amount of clinical and lab experiences. *Id.* ¶¶ 76–77. Viewed in her favor, these allegations suffice to show Reynolds's reasonable reliance. Concordia's motion to dismiss Count III will be denied.

4

In Count IV, Reynolds alleges negligent misrepresentation. Concordia argues this claim fails for lack of duty because, under Oregon law, there is no "special relationship between students and universities." Mem. in Supp. at 40–41; Reply Mem. at 10. As noted, however, Minnesota law governs Reynolds's negligent misrepresentations claim because both Minnesota and Oregon law prohibit negligent misrepresentation claims by parties to an arm's-length commercial transaction. Instead, each forum requires something akin to a "special relationship." *See Conway*, 924 P.2 at 822 (describing a special relationship as one "in which the party sought to be held liable had some obligation to pursue the interests of the other party" and "without reference to the specific terms of the contract" (citation omitted)); *Williams*, 820 N.W.2d at 816–19 (discussing the limited categories of "professional relationships," "fiduciary relationships," and "special legal relationships in which one party has superior knowledge or expertise" in which a duty arises).

Under Minnesota law, negligent misrepresentation occurs when a person in the course of his or her business, profession, or employment, during a transaction in which he or she has a financial interest: (1) supplies false information to another person to guide them in that person's own business transactions; (2) fails to use reasonable care or competence in obtaining the information or communicating it to that person; (3) the other

person relied on the information; (4) the other person was justified in relying on that information; and (5) the other person was financially harmed by relying on the information. *Hardin Cnty. Sav. Bank v. Hous. & Redevelopment Auth. of City of Brainerd*, 821 N.W.2d 184, 192 (Minn. 2012). A threshold requirement is that the supplier of information owe a duty of care to the person relying on it. *Williams*, 820 N.W.2d at 816–17. "[O]ne making representations is held to [a] duty of care only when supplying information, either for the guidance of others in the course of a transaction in which one has a pecuniary interest, or in the course of one's business, profession or employment." *Florenzano v. Olson*, 387 N.W.2d 168, 174 (Minn. 1986). The Minnesota Supreme Court has not found a duty "in the absence of either superior knowledge or a special relationship, particularly in the context of sophisticated parties who are experienced at negotiating the transaction at issue." *Williams*, 820 N.W.2d at 821 n.5. Decisions by the Minnesota Court of Appeals, the Eighth Circuit, and this District establish that no duty arises between parties to an arm's-length commercial transaction. *Rite Aid Corp.*, 519 F. Supp. 3d at 543–44 (collecting cases). "[T]here are some instances where a special relationship between a student and a college or university creates a duty of care." *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 995 (D. Minn. 2017). The only special relationship recognized by Minnesota courts between a university and student, however, has arisen in student disciplinary proceedings, where universities owe a duty "not to arbitrarily expel a student." *Id.* (quoting *Abbariao*, 258 N.W.2d at 112–13); *see also Rollins v. Cardinal Stritch Univ.*, 626 N.W.2d 464, 470 (Minn. Ct. App. 2001) (same).

Reynolds has not plausibly shown that Concordia owed her a duty.  Reynolds's claim does not concern school disciplinary proceedings.  Reynolds cites no binding or persuasive decision imposing a duty under like circumstances.  More critically, she does not allege that Concordia was acting in her interest or supplied information about the ABSN program to guide her in some other transaction or in her business, profession, or employment.  Reynolds's claim is that Concordia promised to deliver instructional services through its ABSN program, that it failed to deliver the contracted-for services, and that it retained money she paid for those services.  The "information supplied," in other words, is merely the misrepresentations or promises that Concordia allegedly breached.  As alleged, Reynolds's claim derives from an arm's-length commercial transaction.

Reynolds argues that a duty arose from the parties' "asymmetrical bargaining power."  Mem. in Opp'n at 42.  In her view, this bargaining power "weighed heavily in favor of Concordia, which maintained exclusive control over the actual education" it provided her.  *Id.*; *see* Compl. ¶ 123.  But Concordia's mere control over the educational services it offers does not transform the parties' arm's-length, payment-for-services commercial transaction from an adversarial relationship into a special one.  If that were enough, nearly any seller of goods or services would owe a duty of care to its customers.  That's not the law in Minnesota.  *See, e.g.*, *Safeco Ins. Co. of Am. v. Dain Bosworth Inc.*, 531 N.W.2d 867, 871–73 (Minn. Ct. App. 1995), *rev. denied*, (Minn. July 20, 1995).  Reynolds's negligent misrepresentation claim will be dismissed under Rule 12(b)(6) on this basis.

5

In Count V, Reynolds asserts a claim of reckless misrepresentation.[10]   Reckless misrepresentation is a variation of fraud and is shown when "a misrepresenter speaks positively and without qualification, but either is conscious of ignorance of the truth, or realizes that the information on which he or she relies is not adequate or dependable enough to support such a positive, unqualified assertion." *Christensen v. Metro. Life Ins. Co.*, 542 F. Supp. 2d 935, 944 (D. Minn. 2008) (quoting *Florenzano*, 387 N.W.2d at 174); *accord Zutz*, 422 F.3d at 770.   "Like fraud, [reckless misrepresentation] occurs where a plaintiff relies on the misrepresentation of another party." *Lyon Fin. Servs., Inv. v. MBS Mgmt. Servs., Inc.*, No. 06-cv-4562 (PJS/JJG), 2007 WL 2893612, at *7 (D. Minn. Sept. 27, 2007).

Concordia argues that Reynolds has not plausibly alleged a misrepresentation or that it acted recklessly.  Mem. in Supp. at 39, 41.  In its view, the statements she identifies are not "cognizable promises to provide *in-person* clinicals, simulations, and lab courses in the midst of a global pandemic and wildfires when Concordia's ability to do so was constrained by external circumstances, particularly available placements, and [when] Concordia expressly reserved the right to make curricular changes." *Id.* at 39.

---

[10]     In Minnesota, the tort of reckless misrepresentation traces to Justice Simonett's concurring opinion in *Florenzano*, 387 N.W.2d at 177 & n.2.  "It is somewhat unclear as to whether or not the *Florenzano* court recognized a cause of action for reckless misrepresentation but the Eighth Circuit concluded that it did in *Zutz v. Case Corp.*, 422 F.3d 764, 770 (8th Cir. 2005)." *C-N-P Nw., Ltd. v. Sonitrol Corp.*, No. 06-cv-2516 (JMR/FLN), 2008 WL 251816, at *6 (D. Minn. Jan. 29, 2008); *see also* 4 Minn. Prac. CIVJIG 57.10 (6th ed. Sept. 2021 Update).

Reynolds has stated a claim of reckless misrepresentation. Reynolds alleges that Concordia made many (already discussed) representations to the effect that, during the ABSN program, she "would receive in-person clinicals, simulations, and skills labs. Compl. ¶ 127. Reynolds also alleges that she "relied on these misrepresentations when enrolling and re-enrolling in [the] ABSN program," *id.* ¶ 128, and that she did not receive the promised experiences, *id.* She alleges that Concordia acted with recklessness by making these representations. *Id.* ¶ 129 ("At the time Concordia made these representations, it was either conscious of its ignorance of the truth of these representations, or realized that the information on which it relied when making the representations was not adequate or dependable enough to support the representations to Plaintiff and the class members."). Reynolds alleges facts to plausibly support her allegation of recklessness. As discussed already, the salient facts all occurred after the pandemic began. Concordia's initial representations to Reynolds about the ABSN program, for instance, occurred after it had "completely eliminated in-person learning," including "hands on training in the on-campus simulation and skills labs" and "all hospital clinical placement or field experience exercises," during the Spring 2020 semester. Compl. ¶¶ 9, 66. After Reynolds enrolled, Concordia continued to make unqualified statements about its clinical, lab, and in-person instruction in syllabi and online during the Fall 2020 and Spring 2021 semesters, despite not offering those experiences or offering far less than what it kept representing to Reynolds. Reynolds has alleged facts plausibly showing that Concordia spoke without qualification about curricular experiences Reynolds would receive despite either not knowing its statements to be true or realizing it had inadequate information to make them.

Concordia also argues Reynolds's allegations do not permit the inference that her reliance was reasonable. This argument mirrors Concordia's reliance argument on Reynolds's promissory estoppel claim and fails for the same reasons. *See supra*, Part IV.B.3. Concordia's motion to dismiss Count V will be denied.

6

In Count VI, Reynolds asserts four distinct claims under Oregon's Uniform Trade Practices Act[11] ("UTPA"), ORS 646.605, *et seq*. These claims will be dismissed.

a

Concordia argues that Reynolds's UTPA claims under § 646.608(1)(a), (e), and (q) fail because the services Concordia offers through the ABSN program are not personal goods or services under the UTPA. Those subsections each apply to transactions involving "real estate, goods or services," defined as those that "are or may be obtained primarily for personal, family or household purposes." ORS 646.605(6)(a). Oregon courts employ a two-part test to decide whether a transaction fits this mold: "[1] Is the real estate, good, or service at issue customarily purchased by a substantial number of people for personal, family, or household use (the objective component) and [2] was it, in fact, purchased by the plaintiff for personal, family, or household use, rather than for commercial use or resale (the subjective component)." *Fowler v. Cooley*, 245 P.3d 155, 159 (Or. Ct. App. 2010) (citing *Searle v. Exley Express*, 564 P.2d 1054 (Or. 1977)). In *Searle*, a truck "designed

---

[11]   Reynolds has withdrawn claims she asserted for "other unfair or deceptive conduct" under ORS 646.608(1)(u) and for advertising the ABSN program "with intent not to provide [it] as advertised" under ORS 646.608(1)(i). Mem. in Opp'n at 53 n.17.

for the business of hauling freight" did not meet the objective element because, although its purchase could "fulfill personal and family needs in a particular case[,] generally it would be purchased to carry on a business." 564 P.2d at 1056; *see also Mill v. Hubbard-Wray Co.*, 630 P.2d 880, 905–06 (Or. Ct. App. 1981) (baler used to support family cattle business not a personal good because balers not purchased substantially for personal, family, or household use), *as modified by* 633 P.2d 1 (Mem.). It is Reynolds's burden to meet both elements. *Roach v. Mead*, 722 P.2d 1229, 1234–35 (Or. 1986) ("legal services plaintiff received concern[ing] the investment of money" were not for personal use).

The parties agree, and independent research seems to confirm, that no published decision has analyzed whether nursing or other post-secondary education constitutes a personal service under Oregon's UTPA. Instead, the parties rely on a handful of decisions analyzing other states' consumer protection statutes landing on either side of the debate. The seminal case is *MacDonald v. Thomas M. Cooley Law School*, 724 F.3d 654, 660 (6th Cir. 2013). In a case filed by law school graduates, *MacDonald* analyzed the Michigan Consumer Protection Act's limitation to acts in "trade or commerce," defined almost identically as "the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes." Mich. Comp. Laws Ann. § 445.902(g). Accepting the complaint's allegations as true, the Sixth Circuit held that the plaintiffs had "bought their legal education . . . for a business purpose," having alleged they intended to use their degree "to prospectively better themselves and their personal circumstances *through the attainment of full-time employment in the legal sector*," and not to "leisurely read and understand Supreme Court Reports." *MacDonald*, 724 F.3d at 661. "[B]ecause

the graduates admitted in their complaint that they bought their legal education for a business purpose, to make a living, the district court correctly concluded that that they failed to state a claim under the Act." *Id.* at 661–62; *accord Suhail v. Univ. of the Cumberlands*, 107 F. Supp. 3d 748, 759–60 (E.D. Ky. 2015) (accepting *MacDonald* and applying its reasoning in action by postgraduate psychology student).

One court has rejected *MacDonald* in construing a similar statute.  In *Sibeto v. Capella University*, a doctoral student filed claims over "educational services in connection with her doctoral dissertation."  No. 2:13-cv-1674, 2014 WL 3547347, *1 (W.D. Pa. June 13, 2014), *report and recommendation adopted*, 2014 WL 3547344 (W.D. Pa. July 17, 2014).  In that court's view, though the plaintiff's education would "make her a more learned person whose personal services would be viewed by the marketplace as being more valuable," that "d[id] not make that education any less 'personal.'"  2014 WL 3547344, at *1.  To find otherwise, it reasoned, would mean "any service purchased and received by a 'person' that could make them of marginally greater value as an employee in the American marketplace could never . . . come within the reach" of Pennsylvania's statute.  *Id.*  A second court has distinguished *MacDonald* based on evidence that a plaintiff's education was "valueless because it did not count toward her nursing degree." *Kerr v. Vatterott Educ. Ctrs., Inc.*, 439 S.W.3d 802, 811 (Mo. Ct. App. 2014).[12]

---

[12]     Reynolds relies on two other decisions interpreting consumer protection statutes, but those cases involved dissimilar text and did not concern a similar requirement that goods or services be purchased "primarily" for personal use.  *Alsides*, 592 N.W.2d at 475 (holding that educational instruction is a "service"); *Brody v. Finch Univ. of Health Sciences/The Chicago Med. Sch.*, 698 N.E.2d 257, 268 (Ill. Ct. App. 1998) (deciding that the sale of educational services occurs "in the course of trade or commerce").

In keeping with the Oregon Supreme Court's two-part test, the better conclusion is that, whatever Reynolds's subjective intent, educational services offered by a university through its bachelor's in nursing program are not objectively personal. The ABSN program is not, in other words, a good or service "customarily purchased by a substantial number of people for personal, family, or household use." A nursing education is ordinarily something used for "commercial" or economic purposes—to earn a living—and this is true despite the attendant personal fulfillment or benefits it might bring. *Cf. Searle*, 565 P.2d at 1056. Concordia offers the ABSN program specifically to those who are serious about pursuing a career in nursing. The program entails "an accelerated learning experience focused solely on nursing" and "is reserved for students who previously satisfied non-nursing college level prerequisites." Compl. ¶ 43. Given the program's focus and exclusivity, it's particularly implausible that a "substantial number" of ABSN students enroll for personal reasons, and not to find employment. Because Reynolds has not plausibly alleged that services she received through the ABSN program are personal goods or services under the UTPA, her claims under ORS 646.608(1)(a), (e), and (q) will be dismissed.

b

Reynolds asserts her remaining UTPA claim under ORS 646.608(1)(c), which prohibits unlawful practices that "[c]ause[] likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another."[13] Reynolds's

---

[13] Unlike neighboring subsections, ORS 646.608(1)(c) omits the defined term "real estate, goods, or services." Thus, the claim is not limited to transactions for personal goods

theory is that Concordia caused likelihood of confusion or misunderstanding as to its affiliation with "Orbis Education, LLC." Mem. in Opp'n at 53–54. The sum of Reynolds's factual allegations about Orbis appear in one paragraph of the Complaint:

> Unbeknownst to Plaintiff, Concordia's ABSN program is designed and managed by Orbis Education, LLC, a subsidiary of the publicly traded corporation, Grand Canyon Education, Inc. Orbis has a unique sales pitch: it provides the upfront capital, the academic platforms, the marketing, the enrollment, the course development, and the "student support," and the universities it contracts with, such as Concordia, provide their reputable and established names. Once the program is established, Orbis and the university "share the revenue" so that the university can "profit without paying a dime" and "can reap the rewards without any financial concern." As of August 13, 2021, Orbis had such relationships with at least 21 universities—including Concordia.

Compl. ¶ 3 (footnotes omitted).

Concordia argues that Reynolds has not plausibly alleged an "ascertainable loss," a requirement to bring suit under the UTPA's private right of action statute, ORS 646.638(a). The Oregon Supreme Court has explained:

> The requirement that the loss be "ascertainable" connotes generally that it is one "capable of being discovered, observed, or established." Thus, the loss must be objectively verifiable, much as economic damages in civil actions must be. But unlike general economic damages in a civil action, the loss required for a UTPA claim must be specifically of "money or property, real or personal." . . . Finally, the ascertainable loss

---

or services. *See Or. Bus. Plan. Council v. LCDC*, 626 P.2d 350, 354–55 (1981) (en banc) ("Ordinarily, when the legislature includes an express provision in one statute, but omits such a provision in another statute, it may be inferred that such an omission was deliberate."); *King Est. Winery, Inc. v. Dep't of Revenue*, 988 P.2d 369, 373 (Or. 1999) ("If the legislature had intended to include machinery and equipment used *to process* fruit and *to sell* the fruit product, it easily could have included those uses in subparagraph (a), as it did in subparagraph (b) for dairy products.").

> must be "a result of" the unlawful trade practice.  That is, the
> unlawful trade practice must have caused the ascertainable loss
> that the plaintiff suffered.

*Pearson v. Philip Morris, Inc.*, 361 P.3d 3, 22 (Or. 2015) (internal citations omitted).

Here, the issue is whether an alleged act that caused a likelihood of confusion or misunderstanding over Concordia's affiliation with Orbis plausibly caused Reynolds to suffer an ascertainable loss.  For perspective, it's important to remember that Reynolds does not challenge Concordia's "pedagogy" or "allege that Concordia fell below any educational standard of care."  Compl. ¶ 20.  Instead, the "loss" she alleges flows from Concordia's failure to deliver what it promised.  *Id.*  To show a resulting loss under ORS 646.608(1)(c) on this theory, Reynolds must plausibly allege that Concordia's undisclosed affiliation with Orbis caused her harm by, for instance, causing Concordia to breach its promises to Reynolds, to make the misrepresentations she alleges, or to retain her tuition and fee payments.  She does not.  Reynolds alleges only generally that Orbis "designed and managed" the ABSN program and "provide[d] the upfront capital, the academic platforms, the marketing, the enrollment, the course development, and the 'student support'" to Concordia.  *Id.* ¶ 3.  The Complaint leaves to the imagination how Concordia's Orbis affiliation could have played some part in Reynolds's alleged loss.  The "sheer possibility" that Orbis played some role does not equate to a plausible inference that Reynolds is entitled to recovery.  *Iqbal*, 556 U.S. at 678.  Because Reynolds has not plausibly alleged an ascertainable loss suffered as "a result of" conduct proscribed by ORS 646.608(1)(c), her claim under that subsection will be dismissed.

## ORDER

Therefore, based on all the files, records, and proceedings in this matter, **IT IS ORDERED THAT** Defendant Concordia University, St. Paul's Motion to Dismiss [ECF No. 20] is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.      Plaintiff Amelia Reynolds's claims, insofar as they seek injunctive relief, are **DISMISSED** without prejudice for lack of subject matter jurisdiction.

2.      Reynolds's negligent-misrepresentation claim [Count IV] is **DISMISSED** with prejudice under Fed. R. Civ. P. 12(b)(6).

3.      Reynolds's claims under Oregon's Uniform Trade Practices Act [Count VI] are **DISMISSED** without prejudice under Fed. R. Civ. P. 12(b)(6).

4.      In all other respects, Concordia's motion is **DENIED**.


Dated:  May 3, 2022                                    s/ Eric C. Tostrud
                                                       Eric C. Tostrud
                                                       United States District Court